# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 4, 2013 Session

## AUBREY TREMAINE EISOM v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dyer County**
**No. 08-CR-228    R. Lee Moore, Judge**

**No. W2012-02355-CCA-R3-PC - Filed September 24, 2013**

Aubrey Tremaine Eisom ("the Petitioner") was convicted by a jury of two counts of first degree felony murder and one count of especially aggravated robbery. The trial court sentenced the Petitioner to life imprisonment for each felony murder conviction and to forty years' incarceration for the especially aggravated robbery conviction, all to run consecutively. The Petitioner subsequently filed for post-conviction relief, which the post-conviction court denied following an evidentiary hearing. The Petitioner now appeals, arguing that he received ineffective assistance of counsel at trial and on appeal. Upon our thorough review of the record and the applicable law, we conclude that the Petitioner is not entitled to post-conviction relief. Accordingly, we affirm the post-conviction court's decision denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

W. Taylor Hughes, Jackson, Tennessee (on appeal), and Danny Goodman, Jr., Tiptonville, Tennessee (at post-conviction hearing), for the appellant, Aubrey Tremaine Eisom.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; and Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Petitioner was convicted by a Dyer County jury of two counts of first degree felony murder and one count of especially aggravated robbery. The trial court sentenced the

Petitioner to life imprisonment for each felony murder conviction and to forty years' incarceration for the especially aggravated robbery conviction, all to run consecutively. On direct appeal, this Court affirmed the Petitioner's judgments. See State v. Aubrey Tremaine Eisom and Cedric Moses, No. W2009-02098-CCA-R3-CD, 2010 WL 4540069, at *19 (Tenn. Crim. App. Nov. 5, 2010), perm. app. denied (Tenn. Mar. 9, 2011). To assist in the resolution of this proceeding, we repeat here the summary of the facts set forth in this Court's opinion resolving the Petitioner's direct appeal:

> The convictions in this case relate to the execution-style murders of Jeffery "Snap" McMullin and Cristin Robinson during the course of the especially aggravated robbery of Mr. McMullin at Mr. McMullin's residence in Dyer County.
>
> Shortly after 11:00 p.m. on August 13, 2007, Barbara Ford was at her home when she heard someone banging on her door and a little boy's voice yelling. Thinking that the boy said, "[M]y cat is dead," Ms. Ford answered the door to find five-year-old Xavier Johnson, who was clad in only blue jeans and socks, covered in blood and "hysterical." Xavier said, "Take me home to my mama; my daddy is dead; he already dead." When Ms. Ford tried to assure him that his father was not dead, Xavier said, "Some gangsters killed my daddy." She asked if he had seen the perpetrators, and he said, "Yeah." She then asked what they had said, and Xavier replied, "Where the money at?" At that point, Ms. Ford went to a neighbor's apartment to call police. She said that Xavier's father lived "[a]bout half a block" from her apartment. She stayed with Xavier and rode with him to the police department.
>
> Ms. Ford clarified that Xavier said "[g]angsters" had killed his father and not "gangster" had killed his father. Ms. Ford also said that she had known [the Petitioner] for 16 years and that, in her opinion, he was "a nice young man."
>
> Dyersburg Police Department Officer David Dodds responded to Ms. Ford's call. Xavier told Officer Dodds, "My daddy's dead," and he directed the officer to Mr. McMullin's residence. After leaving the McMullin residence, Officer Dodds took Ms. Ford and Xavier to the police station and let Xavier watch cartoons rather than ask him any questions about the murders. He explained, "I knew he was gonna have to tell that story to somebody other than me. I didn't want [him] to have to tell it more than once." Eventually Officer Dodds turned Xavier over to Dyersburg Police Lieutenant Billy Williams.

Dyersburg Police Department Sargeant Jason Alexander responded to Mr. McMullin's residence on Upper Finley Road and found the front door ajar. In the bedroom, he "found the two victims l[y]ing in the floor." After determining that no one else was in the house, Sargeant Alexander and the other officers secured the scene and waited for investigators to arrive.

Lieutenant Billy Williams interviewed Xavier, who was present with his mother and uncle, and Xavier told him, "Gangsta killed my daddy." Xavier elaborated that "Gangsta" and another individual killed his father and "a white girl," who he called "Kris." Xavier told Lieutenant Williams that the assailants first shot Ms. Robinson in the mouth and then shot Mr. McMullin in the ear. Xavier said that his "Uncle Gangsta" "had a small gun and the other boy had a[n] oozie," which Xavier described as a "machine gun" that made a "b-r-r-r" sound when it was fired. Xavier described his "Uncle Gangsta" as a "dark complected" African American with "no hair," "a big nose[,] and gold teeth." The only description he could provide of the other assailant was that he wore a blue hat.

Mr. McMullin's cousin, Tamika McMullin, testified that she had known both defendants for approximately 15 years, that [the Petitioner's] nickname was "Gangsta," and that Mr. Moses' nickname was "Big Bo." Mr. McMullin, whose nickname was "Snap," commonly had both illegal drugs and money in his possession. Tamika and her sister drove Xavier and his mother, Shameil Johnson, home from the police station. When they arrived at Ms. Johnson's residence, "Big Bo and Robot w[ere] standing outside" next to "a maroon Impala." She said the men "approached the car and w[ere] talking to Xavier, asking him questions about what had happened that night." Tamika told the men to "leave him alone. Get away from the car."

Tarmara McMullin held Xavier on her lap during the trip from the police station to Ms. Johnson's home. As they rode together, Xavier told Tarmara that his "Uncle Gangster" had murdered his father.

Dyersburg Police Department Officer Jim Joyner arrived at the scene and "recognized the victims to be Crist[i]n Robinson and Jeffery McMullin." After being informed that Xavier had identified "Uncle Gangster" as one of the perpetrators, Officer Joyner focused his investigation on [the Petitioner], whose street name he knew to be "Gangster." He then attempted "to locate vehicles . . . that [the Petitioner] had been traveling in" and found one, a burgundy Impala, behind the Briarwood Apartments parked near the apartment of Atonya Yarbro. In a dumpster located near the vehicle, officers found "a

-3-

partial box of Winchester brand 9mm ammunition, a pair of latex rubber gloves all stuffed in the box, [and] 21 live rounds of ammunition."

When questioned initially, [the Petitioner] claimed to have been "with Dwayne Armstrong getting drunk." Later, [the Petitioner] said that he had been with his "'baby's mama' all night." Sometime in 2008, Officer Joyner received information from a confidential informant that "Paris Wilson would have information about who was involved in the homicide." Paris Wilson was "the girlfriend of Ewan Dwayne Armstrong and she was living in Rayville, Louisiana at the time." Officer Joyner interviewed Ms. Wilson on May 14, 2008, and she implicated Mr. Armstrong in the murders. Mr. Armstrong gave a "complete confession" in October 2008. Based upon Mr. Armstrong's statement, Officer Joyner went to a field in an attempt to locate "[b]urned clothing including shoes, shirts, [and] pants that were allegedly burned following the incident." They were not able to recover the items because the field "probably had been plowed and planted since the incident occurred." In his statement, Mr. Armstrong was able to reveal facts that, until that time, were "[k]nown only to law enforcement and persons who were inside the residence when the incident occurred."

Officer Joyner admitted that there was no evidence placing [the Petitioner] in the maroon Impala on the day of the offenses and that the interior of the Impala was not dusted for fingerprints. In addition, no fingerprints were recovered from any of the items found in the dumpster and the officers could not affirmatively determine who had placed the items in the dumpster.

Dyersburg Police Department Evidence Technician Thomas Langford responded to Mr. McMullin's residence and observed a cellular telephone in the middle of the living room floor. A short time later, another officer noticed that the telephone appeared to be on, so Officer Langford picked it up and determined that Kelly Coles was on the other end. Officer Langford learned that the telephone belonged to Mr. McMullin and that Ms. Coles lived in Mayfield, Kentucky. Officer Langford also found a $20 bill and a $10 bill on the ground on the west side of Mr. McMullin's house. None of the physical evidence recovered from the scene, however, connected either [the Petitioner] or Mr. Moses to the murders. Officers found marijuana and more than $500 in cash inside Mr. McMullin's residence.

Within "a week or two" of the homicides, Officer Langford took a statement from Mr. Armstrong wherein Mr. Armstrong denied any involvement in the murders.

-4-

Kelley Coles, the mother of two of Mr. McMullin's children, testified that at approximately 10:00 p.m. on the evening of August 13, 2007, she was on the telephone with Mr. McMullin when she heard him say, "Don't do this in front of my son. Just hold on, . . . I don't have a gun . . . take whatever you want." She also heard a female voice, Xavier's voice, and two male voices. She said, "After a few minutes I heard gunshots. . . . I heard two different sets of gunshots." Ms. Coles remained on the telephone for "close to an hour" before Officer Langford picked up the telephone and spoke to her. During that time, she heard other voices and noises in the house. After she talked to Officer Langford, Ms. Coles called several of Mr. McMullin's friends, including [the Petitioner], who was "[a]t his girlfriend's with his girlfriend."

Atonya Yarbro, who was living at 2203 Parr Avenue, Briarwood Apartments on August 13, 2007, allowed Mr. Moses, who often drove a maroon Impala like the one found outside Ms. Yarbro's apartment on the day following the murders, to stay with her "[o]ff and on." When Ms. Yarbro left for work on August 13, 2007, Mr. Moses was at her apartment, and the Impala was parked outside. When she returned home from work sometime after 11:00 p.m., Mr. Moses was gone, and the Impala was not in the parking lot. Despite her apartment's having two bedrooms, Ms. Yarbro and her son slept on the couch on the evening of August 13, 2007. When she awoke the following morning, the "cover was just messed up" on one of the beds in one of the bedrooms, but Ms. Yarbro could not say with certainty whether Mr. Moses had been in the apartment during the night. She said that Mr. Moses had a key to the apartment.

Nakeshia McClain, the mother of one of [the Petitioner's] children, testified that [the Petitioner's] nickname is Gangster and that Mr. Moses, who is her uncle, went by the nickname of "Bo." The maroon Impala belonged to her, and she allowed Mr. Moses to use the car "from time to time." After she lost her job and was unable to make payments on the car, Ms. McClain allowed [the Petitioner] to drive the car for a short period of time.

According to Ms. McClain, Mr. McMullin was a friend of both defendants, but Mr. McMullin and [the Petitioner] "were more like brothers." [The Petitioner] had given Mr. McMullin "a car when he . . . first got out of prison" and had helped take care of Xavier during Mr. McMullin's incarceration.

In addition to the child he fathered with Ms. McClain, who was born on December 12, 2007, [the Petitioner] and Annwan Miles had a child together on July 30, 2007. As a result, [the Petitioner] stayed overnight with Ms. Miles in the summer of 2007.

Dyer County Sheriff's Department Officer Terry McCreight, who lived next door to [the Petitioner's] mother, saw [the Petitioner], Mr. Moses, and another black male standing together in her driveway when he got home from work at approximately 6:00 p.m. on August 13, 2007. Mr. McMullin's neighbor, Joe Blue, also saw [the Petitioner] and Mr. Moses together on the afternoon of August 13, 2007, although he recalled that they were driving a small green car.

In the fall of 2008, Officer McCreight received a call reporting that weapons had been discovered in an abandoned house on McGuire Road. He recovered the weapons, which had been "drug . . . out from underneath a wood porch and they were in a plastic bag, garbage type bag." Both weapons were loaded, but neither weapon was linked to [the Petitioner] or Mr. Moses.

Tennessee Bureau of Investigation Special Agent and firearms examiner Dan Royse examined the Charter Arms Model 44 "five shot revolver" and the HiPoint 9mm Luger recovered by Officer McCreight. He concluded that the Charter Arms Model 44 revolver fired the three bullets recovered from Mr. McMullin's body and that the HiPoint 9mm Luger semi-automatic carbine, or short rifle, fired the bullets recovered from the mattress and floor in the bedroom of Mr. McMullin's residence. Both weapons were very muddy and very rusted.

Agent Royse also examined the 9mm cartridge casings found at the scene and concluded that the bullets were manufactured by Winchester, which was the same manufacturer and caliber as the box of ammunition discovered in the dumpster. He compared the manufacturer's marks on the cartridge casings found at the scene with the live ammunition found in the dumpster and determined that three of the 21 live cartridges from the dumpster were manufactured by the same "bunter tool" as the cartridge cases found at the scene. He explained, "A bunter tool is basically a hardened steel dye with raised numbers and letters in reverse on it. And they're brought down under tremendous pressure onto the brass head of the cartridge or cartridge case and it basically stamps those characters into the heads." The expected life span for a bunter tool used by Winchester is 180,000 cartridges. A live cartridge recovered with the 9mm weapon was manufactured "using the same bunter

tool" as six of the live cartridges in the box of ammunition recovered from the dumpster. Agent Royse testified that the most he could say with regard to the bullets recovered from Mr. McMullin's body and those found in the dumpster "is that they were manufactured using the same tool which would put them within a day or two of production life." He emphasized, "I can't say that the cartridge case from the crime scene came from that box of ammunition. I can say it's consistent with it, but I can't say that it came from that one."

Ewan Dwayne Armstrong, who was incarcerated on charges of two counts of first degree murder and one count of especially aggravated robbery in connection with the victims' deaths, testified that he had not reached a plea agreement with the State but had agreed to testify against [the Petitioner] and Mr. Moses. Mr. Armstrong, who had been previously convicted of bank robbery and incarcerated in a federal penitentiary in Louisiana, testified that he was living in Evansville with his then-pregnant girlfriend, Paris Wilson, and her two-year-old son in a house provided to them by his aunt on August 13, 2007. Mr. Armstrong, who was a friend of both defendants, testified that on that day, he and [the Petitioner] were walking [the Petitioner's] pit bull dog and discussing the financial difficulties occasioned by the impending births of their children when [the Petitioner] suggested to Mr. Armstrong that they rob Mr. McMullin "to get some money together." According to Mr. Armstrong, [the Petitioner] claimed to know "[w]here he kept his money and drugs" and expressed a preference to go into Mr. McMullin's house when Mr. McMullin was home "to make sure he got everything out of the house."

Later that same night, [the Petitioner] came to the residence Mr. Armstrong shared with Ms. Wilson and asked Mr. Armstrong if he was "ready." Mr. Armstrong recalled that, "Big Bo was still standing outside by the car," which Mr. Armstrong identified as the maroon Impala later found parked outside Ms. Yarbro's apartment. Mr. Armstrong dressed in "black jogging pants" and a black t-shirt because [the Petitioner] was clad in "some faded black jeans and some old worn work shoes and a black shirt." He said that the three men smoked a "blunt," which he described as a cigar "[w]ith weed inside of it," before they left. Mr. Moses drove the car while Mr. Armstrong armed himself with a 9mm carbine and [the Petitioner] armed himself with a Charter Arms revolver. Mr. Armstrong said that Mr. Moses dropped him and [the Petitioner] off in a cul-de-sac across from Mr. McMullin's residence and that the two men made their way "around the back of the house," where they waited on either side until Mr. McMullin arrived in his car. Both Mr. Armstrong and [the Petitioner] had fashioned t-shirts into

"makeshift masks" so that their faces were concealed, with "[n]othing[ ] showing but [their] eyes."

When he heard the car door close, Mr. Armstrong came out of his "hiding spot" and saw [the Petitioner] walking toward Mr. McMullin with his gun drawn. According to Mr. Armstrong, Mr. McMullin, who had been talking on a cellular telephone, "had his hands up but he still had the phone to his head." Mr. Armstrong said that Mr. McMullin "said something to the effect of not in front of his son, while his son was in the house and . . . he said he didn't have a gun on him or any kind of weapon." When they entered the house, Mr. Armstrong saw Ms. Robinson and Xavier seated on the couch. Mr. Armstrong said that once inside the house he "veered to the left into the bedroom" so that he could "see if anybody was in the house, but they wasn't." While he was in the bedroom, Mr. Armstrong "heard a lot of clutter and a lot of rattling going on in the front room." He went back toward the living room and saw that [the Petitioner] was "roughing [Mr. McMullin] up, like tossing him around or whatever and he had the pistol on him." At that point, Ms. Robinson took Xavier into the bedroom where Mr. Armstrong still stood. He heard [the Petitioner] and Mr. McMullin talking in the living room. He described the conversation:

> I heard [the Petitioner] tell him, he was saying something to the effect that—he was saying something about $75; he was like, that's all I'm worth. He was like, nigga I loves you and [Mr.] McMullin was saying back to him I love you, too; we supposed to be brothers. And [the Petitioner] was saying stuff like, if I was supposed to be your brother you left me in that jail and you ain't give a F about me or whatever. So there was a lot of that going back and forth and I heard him saying come on, Gangster, man, ain't gotta be like this man.

Then [the Petitioner] led Mr. McMullin into the bedroom where Mr. Armstrong, Ms. Robinson, and Xavier were. Mr. Armstrong said that he searched the bedroom but found no money or drugs. When [the Petitioner] asked, "[W]here's the rest of it," Mr. McMullin "stood up and he reached in his pocket and he grabbed a wad of money out of his pocket and threw it on the bed." Mr. Armstrong retrieved the money and put it into the pocket of the shorts he was wearing underneath his jogging pants. [The Petitioner] then told Mr. McMullin to get down on his knees, and Mr. McMullin complied. [The Petitioner] then shot Mr. McMullin three times in quick succession. Mr. Armstrong claimed that after shooting Mr. McMullin, [the Petitioner]

"snapped the pistol out of [Mr. Armstrong's] hand and he put it to the back of [Ms. Robinson]'s head and he shot one time." At the time Ms. Robinson was shot, she had her body folded protectively over Xavier, so that she was kneeling somewhat on the bed. Mr. Armstrong denied shooting either of the victims.

Mr. Armstrong said that following the murders, he and [the Petitioner] made their way out of the house, across the street, "through the projects, through this field" and across a "big ditch" and then [the Petitioner] used his cellular telephone to call Mr. Moses to pick them up. Once in the car, [the Petitioner] said to Mr. Armstrong, "I wasn't trying to give you no case back there. I had to do it like that because I only had three bullets." [The Petitioner] then told Mr. Moses that he had murdered the victims. Mr. Moses drove to Mr. Armstrong's residence, dropped Mr. Armstrong off, and then drove to get gas while [the Petitioner] went back to the field to recover the revolver he had dropped as they ran.

When the two men returned to Mr. Armstrong's residence "about fifteen to twenty minutes" later, Mr. Moses told them that he had heard that Xavier had told police that Gangster had killed his father. The three then got back into the maroon Impala, and Mr. Moses drove them to "the country," where Mr. Armstrong and [the Petitioner] placed their clothes in a box and set them on fire using the gasoline procured by Mr. Moses as an accelerant. After returning to Mr. Armstrong's residence, [the Petitioner] gave Mr. Armstrong $700 of the $1900 in robbery proceeds and asked him to dispose of the weapons. [The Petitioner] also divided the drugs the pair had taken during the robbery. He said that [the Petitioner] kept $200 or $300 for himself and gave the rest to Mr. Moses. Mr. Armstrong explained that [the Petitioner] "had already made a determination he was gonna turn himself in."

Mr. Armstrong said that after [the Petitioner] and Mr. Moses left, he wiped the guns down, placed them in a plastic garbage bag, and put them under the porch of an abandoned house in Middle City. He said that when he returned home, he woke Ms. Wilson and told her what had happened, explaining that he might send her back to Louisiana to avoid being the target of retribution for the victims' murders.

Mr. Armstrong admitted that when he was initially questioned by Dyersburg authorities, he denied any involvement in the crime. He also admitted that when he was later arrested in Rayville, Louisiana on June 10, 2008, he initially told the officers, "I didn't kill anybody and I didn't rob

anybody." He stated that he opted to provide a full confession when he returned to Tennessee and had gotten "proper advice from [his] counsel." Mr. Armstrong denied any "bad blood" between him and the defendants and said that he had no reason to lie about their involvement in the crimes.

Mr. Armstrong stated that he knew Ms. Robinson's husband, Jonathan Robinson, but said that he had not seen Mr. Robinson since he had been released from federal prison. He said he also knew Ms. Robinson because, at the time of her murder, she was dating his friend, Carlos Sharp. Mr. Armstrong denied seeing Mr. Robinson in city court on August 13, 2007, and denied having any discussion with Mr. Robinson about the burglary of Mr. Robinson's residence.

Mr. Armstrong's former girlfriend and the mother of two of his children, Paris Wilson, testified that on August 13, 2007, [the Petitioner], who she knew as Gangster, and another man, who she described as a large black man, came to the small one bedroom house she shared with Mr. Armstrong, and she "peeped" out of the bedroom window to see "the burgundy Impala parked like backed up in the driveway." She identified a photograph of the maroon Impala found parked outside the Brookside Apartments on August 14, 2007, as being like the car she saw, but she stated that the Impala she saw had darker tinted windows. She said that Mr. Armstrong left with the men and that when he returned sometime later, the two argued because she accused him of leaving "to be with somebody else." Mr. Armstrong at first claimed he had been "riding around . . . busting blocks." She said she did not believe him because "it don't take that long to bust blocks." Ms. Wilson said that Mr. Armstrong left their home and returned only once and that he had not come and gone several times as he testified. Eventually, Mr. Armstrong told her what had happened: "He told me that something bad had happened. I said something bad like what. And he was like I can't tell you. I was like well, you gonna tell me something. So that's when he told me. Told me that Gangster had killed somebody." She said that Mr. Armstrong did not provide any further details about the offenses.

She said that she remained in Dyer County for only one week before she returned to her hometown of Rayville, Louisiana and that Mr. Armstrong came to Rayville when she gave birth to their child in December 2007. She did not tell anyone about Mr. Armstrong's revelation until the following year when she was contacted by Dyer County investigators. Ms. Wilson said that the thought of calling the police to report the murders never crossed her mind.

Davidson County Assistant Medical Examiner and forensic pathologist Doctor Feng Li testified that Mr. McMullin suffered three "penetrating gunshot wounds, meaning the bullets [were] still inside the body." Gunshot wound A was "located on the left flank area," and it "penetrated through the left posterior lateral aspect of the rib cage, specifically the eighth rib, perforated the diaphragm, the lower lobe of the left lung, the heart and a bullet [was] lodged and recovered subcutaneously . . . on the right side of the chest wall." Gunshot wound B was "on the left lower back," and it "penetrated through the abdominal cavity and injured left kidney medullaries meaning, you know, the softer tissue around intestines and intestines itself and" the bullet was recovered "inside the abdominal wall." Gunshot wound C was "on the right posterior shoulder, and it penetrated "the skin, the muscle and the bone of the right shoulder" and was recovered from "the right chest wall." Gunshot wounds A and B traveled from back to front, right to left, and upward. Gunshot wound C traveled from back to front, right to left, and downward. Gunshot wound A was "the most serious because it damage[d] lung, the heart and so on." Mr. McMullin would have succumbed to that wound "within minutes, if without any rescue effort."

Ms. Robinson suffered a single gunshot wound to the head. "This gunshot wound [wa]s a contact, perforating gunshot wound of the left oc[c]ipital region meaning on the back of . . . the head." The "searing" and "soot material" around the wound indicated that the muzzle of the gun had been resting on Ms. Robinson's head when the shot was fired. Doctor Li explained,

> This wound is on the left side on the back of the head and the bullet penetrated through but not penetrated into the cranial cavity, meaning not inside of the head but penetrated through the high level of the spinal column and caused some epidural hemorrhage around the spinal cord and some synovial hemorrhage on the cerebellum although, you know, the bullet does not penetrate into the head itself but the power, the pressure causes some hemorrhage around the cerebellum and the bullet exits through the right side of the cheek.

> The bullet "[t]raveled forward, rightward and slightly downward." Damage of the type caused by the gunshot wound would have caused Ms. Robinson to die "instantaneously." He also found "multiple varying colored contusions on the body" of Ms. Robinson.

-11-

Ms. Robinson's husband, Jonathan Robinson, testified that the couple had been married for five years at the time of the murders, but they had been separated for "[s]ix to eight months." Mr. Robinson admitted that he assaulted Ms. Robinson on November 19, 2005, on March 12, 2006, and again on July 31, 2007, stating, "[N]o marriage is perfect." He blamed the assaults, during which he lifted Ms. Robinson off of the ground and "slammed her," on his intoxication "with alcohol, weed and a lot of pills." He recalled being released on bail on drug charges on the afternoon of August 13, 2007, and admitted that he also attended city court on that same day because he had violated Ms. Robinson's order of protection by going to her place of employment. Mr. Robinson, who remained in the marital residence following the couple's separation, said that he did not know where Ms. Robinson was living at the time of her death and that, although he knew Mr. McMullin, he did not know where Mr. McMullin lived or that Ms. Robinson was with Mr. McMullin on August 13, 2007. Mr. Robinson admitted telephoning Ms. Robinson at 8:42 p.m., 9:07 p.m., and 9:16 p.m. on August 13, 2007, and leaving threatening messages on Ms. Robinson's cellular telephone. He explained, "I was threatening to beat her up because of what she did." Mr. Robinson denied playing any role in the murders.

Mr. Robinson testified that officers came to his residence at 3:30 a.m. on August 14, 2007, and that he thought they were there to "see if [he] had any more weed." He said that he did not believe it when officers told him that Ms. Robinson had been killed.

Dyersburg Police Department Investigator Monty Essary went to Mr. Robinson's residence just after the murders and observed that the hood of Mr. Robinson's car was cool and that there were no lights on in the home. When he answered the door, Mr. Robinson was dressed in "boxer shorts and [a] wife beater" and appeared to have been asleep. He allowed the officers to look through his house. When they told him that Ms. Robinson had been murdered, Mr. Robinson "just lost it, just started crying." He gave officers consent to search the residence, and they found no weapons or drugs.

Following this proof, the State rested. Mr. Moses presented no proof. [The Petitioner], however, presented the testimony of several witnesses.

Local bail bondsman Larry Baltimore posted a bond for [the Petitioner] on August 13, 2007, and then drove [the Petitioner] to a residence in Milltown. Mr. Baltimore described [the Petitioner] as a "fine young man," despite

knowing that [the Petitioner] had been previously incarcerated for a conviction of aggravated robbery wherein he shot the victim.

Willie Moorer, who lived with [the Petitioner's] mother, Cathy Gardner, testified that on August 13, 2007, [the Petitioner] ate dinner with him and Ms. Gardner and that at approximately 8:30 or 9:00 p.m., he drove [the Petitioner] "[t]o his baby mama house." He dropped [the Petitioner] off at Ms. Miles's residence and left. [The Petitioner] and Mr. Armstrong walked [the Petitioner's] dogs before dinner on August 13, 2007.

Annwan Miles, the mother of [the Petitioner's] daughter born in July 2007, testified that although she and [the Petitioner] were not romantically involved at the time their daughter was born, they "made arrangements that [the Petitioner] would stay [at Ms. Miles's residence] and help" following her birth. On August 13, 2007, Ms. Miles, her three-year-old daughter, Quentera, and Laquanda Matthews' three-year-old daughter, Sereta, were at Ms. Miles's residence with [the Petitioner] and the newborn baby. [The Petitioner] arrived at her home at "[a]bout 9:00" p.m., and she "took a shower and went to bed." Ms. Miles said that her infant daughter "was real spoiled. She cried too much. So we basically had to hold her all the time." She said that [the Petitioner] came to the home on August 13, 2007, to hold the baby because she "wasn't gonna do it." When she finished her shower, Ms. Miles went to bed and left [the Petitioner] babysitting the three little girls. Sometime later, she got a call from Terry Lee Adams, who asked to speak to [the Petitioner]. Ms. Miles maintained that the baby would have cried if [the Petitioner] had put her down and that she did not hear the baby cry all night. After receiving several telephone calls, Ms. Miles asked [the Petitioner] to leave the apartment because she feared for her own safety and for the safety of the children.

[The Petitioner's] cousin, Laquanda Matthews, testified that on August 13, 2007, she took her three-year-old daughter to Ms. Miles's residence to spend time with [the Petitioner] because "she liked being around him." She let her daughter spend the night with [the Petitioner] and Ms. Miles. When she awoke the following morning and saw [the Petitioner's] photograph on the news, she called 9–1–1 and asked police not to hurt [the Petitioner] because her daughter was with him. She also saw Mr. Armstrong walking from the direction of Ms. Gardner's house at approximately 8:00 p.m. on August 13, 2007.

Ms. Gardner and Joyce McMullin, [the Petitioner's] grandmother, testified that they both telephoned [the Petitioner] at Ms. Miles's residence to

tell him that Mr. McMullin had been killed. Fred P. Wells, II, testified that he had also telephoned [the Petitioner] at Ms. Miles's residence to inform him of the murders.

Qiandra Johnson, who lived near Mr. McMullin, testified that at approximately 10:00 or 10:30 p.m. on August 13, 2007, she was watching television when she saw "a fellow dressed in all black walking down the street . . . and he had like long dreads." She said that the man "walked down the street and behind the house next door to Mr. McMullin's house and just disappeared." She knew [the Petitioner], and the man was not [the Petitioner].

Xavier's mother, Shameil Johnson, testified that while she was reading the paper on August 14, 2007, Xavier pointed to a photograph of Mr. Robinson and ran away. When she caught up with Xavier he said, "He was there, too" and pointed at the photograph of Mr. Robinson. Xavier said that Mr. Robinson "was the guy that killed his dad."

Ms. Johnson said that Mr. Moses was waiting at her residence when she returned from the police station with Xavier and that he asked her if "everything was all right . . . and he said if I needed anything to let him know. He was trying to be a friend." He did not attempt to talk to Xavier.

Ms. Johnson's cousin, Tiffany Fields, said that Ms. Johnson and Xavier spent the night at Ms. Fields's house after they left the police station. On the following day, Mr. Robinson's photograph appeared in the newspaper, and Xavier refused to let anyone throw the paper away. Xavier pointed to the picture and told her that he had seen Mr. Robinson before. He did not say that Mr. Robinson had killed his father.

Crystal Richards, who had dated Mr. Robinson "five or six years" before the trial and who was a friend to Mr. McMullin, testified that during their relationship, Mr. Robinson "was very abusive" and, at one point, had "[h]eld a gun to [her] head." She testified that she and Mr. Robinson got into an altercation at a club and that on the following morning, "[she] woke up and he had a 9mm to the back of [her] head and told [her] he would kill [her] if [she] ever did that again." She said that Mr. Robinson was also abusive to her children and that he had held her hostage in her own home by nailing "2x4's up over the door." She said that he tried to force her to drink gasoline when she tried to leave him.

Id. at *1-10.

-14-

The Petitioner subsequently filed a petition for post-conviction relief, alleging multiple instances of ineffective assistance of counsel at trial and on appeal ("trial counsel"). Although the Petitioner claimed numerous instances of ineffective assistance in his petition, he has raised only three issues on appeal: that trial counsel erred in stipulating to the out of court statement of Xavier Johnson that "Gangsta killed my daddy"; that trial counsel erred when he "opened the door" to the Petitioner's prior criminal record at trial; and that, on appeal, trial counsel failed "to include transcripts that were necessary to the Petitioner's direct appeal." Accordingly, we will address only the facts adduced at the post-conviction hearing relevant to these issues.

At the post-conviction hearing, the Petitioner testified that trial counsel represented him from his arraignment through his direct appeal.[1] As to his first allegation of trial counsel's ineffectiveness, he stated that from the beginning he wanted "to confront [his] accuser," five-year-old Xavier Johnson, who "was at the base of the whole accusation." At the preliminary hearing, the court found that the child was incompetent to testify. When the Petitioner discussed the child's testimony with trial counsel, trial counsel told him that the testimony "was inadmissible and that he wouldn't have to worry about it because [trial counsel] was going to file motions to have the evidence excluded."

The Petitioner stated that he continued to ask trial counsel about this testimony, and trial counsel repeatedly told him, "We're gonna get to it." Once the trial commenced, the State began introducing the child's testimony through other witnesses. The Petitioner asked trial counsel to object, and trial counsel complied and had a bench conference over the issue. After the bench conference, trial counsel told the Petitioner that the motions regarding this testimony "had been denied and that the evidence was coming in." The Petitioner stated that the testimony that he wanted excluded, and that the jury ultimately heard, was: "[Xavier] supposedly had described me to Lieutenant Williams as being his uncle and told [him] I had a big nose and a bald head and some gold teeth, and that I had killed his father, and that I had shot the . . . female victim, also." He also wanted Tamara McMullen's[2] testimony excluded that "on the way home from the police station, . . . [Xavier] supposedly had told her that somebody named Gangster, Uncle Gangster, had killed his father." After the trial, trial counsel told the Petitioner that "[h]e stipulated with the [State] to allow hearsay in, in order to get inconsistent statements that [Xavier] had made in." The Petitioner believed he would

[1] The Petitioner explained that another attorney represented him at his preliminary hearing. According to the Petitioner, the State nolle prossed the case, he was "re-indicted," and trial counsel began representing him at the arraignment on his "re-indicted" offenses.

[2] In the opinion on direct appeal, this witness' name was spelled "Tarmara McMullin." See Aubrey Tremaine Eisom and Cedric Moss, 2010 WL 4540069, at *2.

not have been convicted had he been able to cross-examine Xavier regarding these statements.

The Petitioner was unaware that the State was going to introduce evidence regarding the Petitioner's nickname being "Gangster" and stated that at least five witnesses testified to this fact. The Petitioner did recall that trial counsel planned to file a motion in limine as to the introduction of evidence regarding the nickname, but the Petitioner "never did see it."

The Petitioner next stated that trial counsel had instructed him not to testify based on the Petitioner's prior conviction that was similar to the present case. The Petitioner agreed with trial counsel and, accordingly, decided not to testify. However, the testimony came in anyway because trial counsel "asked a witness what kind of person [the Petitioner] was." The State then introduced the Petitioner's conviction through that witness, Larry Baltimore. According to the Petitioner, trial counsel told him, "Dog, I messed up." Trial counsel still advised the Petitioner not to testify, so the Petitioner did not. He felt that, with the evidence of the conviction coming in, he should have testified, given that his "co-defendant"[3] testified against him.

The Petitioner testified that, on appeal, trial counsel never submitted transcripts of the pretrial hearings, which related to some issues the Petitioner wanted to raise on appeal. The Court of Criminal Appeals "waived a couple of [the Petitioner's] issues because [trial counsel] didn't cite case law, . . . he didn't put authorities."

On cross-examination, the Petitioner acknowledged being present at the preliminary hearing and witnessing that court finding Xavier incompetent to testify as a witness. He further acknowledged that, at that hearing, when the State introduced Xavier's statement through another witness, the court overruled the defense's objection under the excited utterance exception. Moreover, he was aware that trial counsel intended to introduce Xavier's other statement regarding his identification of other individuals as the one who killed his father. The Petitioner identified at the hearing the stipulation that Xavier was not competent to testify at trial. He acknowledged that, at the preliminary hearing, the State also elicited references to the Petitioner's nickname, "Gangster."

The Petitioner denied that, prior to trial counsel's calling Larry Baltimore to testify, he told trial counsel, "He knows me, he's my friend." He acknowledged that he had a jury-out proceeding in which he waived his right to testify. After the testimony was elicited

---

[3] The Petitioner testified that his "co-defendant" testified against him. However, Mr. Moses did not testify at the trial or present any proof. Rather, Mr. Armstrong, an accomplice who was not a co-defendant in the trial, testified against the Petitioner.

regarding his prior conviction, he told trial counsel that he "might as well" testify but that trial counsel told him not to testify because the State would "trip [him] up."

Trial counsel testified that he represented the Petitioner in his trial on two counts of murder and one count of especially aggravated robbery. Regarding the stipulation that Xavier was incompetent to testify, trial counsel knew that the court at the preliminary hearing had ruled Xavier incompetent to testify. He continued,

I was aware that the young boy . . . made certain statements to individuals that I didn't think I would ever be able to get in, where he named other people as the shooter or that killed his daddy. I also knew and felt after research and what I knew about the matter that the testimony of the boy would probably not be allowed, thus the stipulation with the attorney general . . . . So, I went to the attorney general's office. And I also felt like that young man's statement was an excited utterance. I think that would have been ruled without agreeing to it.

Trial counsel confirmed that it was his idea to stipulate to the hearsay statements regarding Xavier's identifications. He acknowledged that, when Xavier was found incompetent at the preliminary hearing, he was five years old and that, at the time of trial, he was seven years old. He stated, however, that Xavier also was taking seizure medication and that trial counsel "made that decision at the time and cleared it with [the Petitioner]." Trial counsel did not believe that the admission of the nickname "Gangster" would be unfairly prejudicial to the Petitioner.

Regarding the Petitioner's decision not to testify, trial counsel stated,

[A]ll I can say is that in my years of experience, never, never have I told someone – given them an opinion about don't testify because of this reason or that. It's always up to the individual client. He knew his – what his record was . . . . He knew that that's something that we'd hoped we could keep out from the jury. But I did not ever tell him don't testify.

Trial counsel stated that, when he called Baltimore to testify at trial,

I was sitting right there next to [the Petitioner]. . . . And [the Petitioner] . . . grabbed me by the arm and pulled me back down and said, "He likes me. He's a good friend." And . . . I don't know that he told me to go up and ask that question, but that – by pulling me back and saying, you know, "He's a good friend of mine, he really likes me," I came up here and I asked that question. And I got – the only reason I think I did it is because it was right new to me;

-17-

he pulled me back and made that point, so I came up and asked him that question that he's mentioned here. And, of course, the DA jumped all over it. . . . And after it was over, I think he would go on and tell you that I came back – after Baltimore was excused, I went back around and sat down with him and said, "Well now, look here." You know, "You pulled my arm." And he said, "Yeah, I shouldn't have done it."

Regarding his representation on direct appeal, trial counsel stated that he had requested an extension of time for the preparation of the transcripts. He requested an order from the trial court asking that "the transcripts of the entire proceedings" be transcribed. However, once the deadline had passed on the extension, trial counsel realized that a different court reporter actually had transcribed "some of these motion hearings," so he could not retrieve these transcripts.

On cross-examination, trial counsel confirmed that he was not the Petitioner's counsel at the original preliminary hearing. He stated that his two main defenses at trial were "alibi and the third party matter of Mr. Jonathan Robinson being the shooter." Trial counsel confirmed that one of Xavier's statements that he wanted to introduce actually identified Robinson as the person who killed Xavier's father.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently issued a written order denying relief. In its order, the post-conviction court stated,

> The Court finds that [trial counsel] is an able trial counsel. . . . The Court finds that the stipulation referred to in this case was a part of trial strategy that was discussed between counsel and the petitioner prior to trial so that the choices made in this case were informed choices based on adequate preparation. . . . The Court finds that trial counsel and petitioner had a discussion both before trial and during trial about the right to testify. The Court also conducted a hearing during the trial so that petitioner was fully advised of his right to testify and his right against self incrimination. The petitioner chose not to testify and there is no basis for post-conviction relief on this issue.
>
> The issue of whether or not trial counsel allowed into evidence the statement of Xavier Johnson is part of the trial strategy dealing with the defenses available to the petitioner in this case. The Court does not find that the petitioner is entitled to post-conviction relief on the issue of appeal. The petitioner first of all did not indicate what issues on appeal he felt should have been raised. Evidently, there were some pre-trial motion issues that were not

-18-

included in the transcript. Trial counsel referred to a Motion to Sever and a Motion for a Bill of Particulars. There is no evidence before the court that even if these matters had been pursued that it would have changed the outcome of the trial. Petitioner has failed to show any prejudice and the Court finds that the petitioner has failed to prove that trial counsel's performance was deficient or that any omission or act by trial counsel resulted in prejudice to the petitioner so as to deprive him of a fair trial.

Thus, the post-conviction court denied relief, and the Petitioner timely appealed.

## Analysis

Relief pursuant to a post-conviction proceeding is available only when the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see also Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

The Petitioner argues that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[4] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under

---

[4] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn,

202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

*Stipulation as to Xavier's Statements*

The Petitioner first asserts that trial counsel erred in stipulating to the out of court statements of Xavier Johnson. The State disagrees.

Turning to the deficiency prong, the post-conviction court stated in its order denying relief, "The Court finds that the stipulation referred to in this case was a part of trial strategy that was discussed between counsel and the petitioner prior to trial so that the choices made in this case were informed choices based on adequate preparation." The court further stated, "The issue of whether or not trial counsel allowed into evidence the statement of Xavier Johnson is part of the trial strategy dealing with the defenses available to the petitioner in this case."

The evidence does not preponderate against the post-conviction court's findings. Trial counsel testified at the post-conviction hearing that he knew Xavier had been ruled incompetent to testify at the preliminary hearing. He continued,

> I was aware that the young boy . . . made certain statements to individuals that I didn't think I would ever be able to get in, where he named other people as the shooter or that killed his daddy. I also knew and felt after research and what I knew about the matter that the testimony of the boy would probably not be allowed, thus the stipulation with the attorney general . . . . So, I went to the attorney general's office. And I also felt like that young man's statement was an excited utterance. I think that would have been ruled without agreeing to it.

Trial counsel also stated that he "cleared" this decision with the Petitioner.

Thus, the proof established that trial counsel, after adequate preparation, decided to stipulate to the admissibility of Xavier's statements in exchange for the admission of other statements that were favorable to the Petitioner. These other statements, in all likelihood, would not have been admissible otherwise. Without any further showing by the Petitioner, we will give deference to trial counsel's informed decision. See Cooper, 847 S.W.2d at 528.

-21-

To the extent the Petitioner contends that trial counsel should have challenged the admission of Xavier's testimony, rather than stipulate to allow in the testimony regarding the other identifications, we "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" Honeycutt, 54 S.W.3d at 767 (quoting Strickland, 466 U.S. at 689). The post-conviction court implicitly accredited trial counsel's testimony over that of the Petitioner, and we will not disturb those credibility findings on appeal. See Momon, 18 S.W.3d at 156. Therefore, the Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we do not need to address the prejudice prong. See Goad, 938 S.W.2d at 370. Accordingly, the Petitioner is entitled to no relief on this basis.

*The Petitioner's Criminal Record*

Next, the Petitioner argues that trial counsel was ineffective when he "opened the door" to the Petitioner's prior criminal record at trial. The post-conviction court, in denying relief, addressed the Petitioner's choice not to testify at trial but did not address separately trial counsel's questioning of the defense witness which led to the State's introduction of the Petitioner's criminal record. We will address the issue of trial counsel's questioning of the witness as a separate issue.[5]

We first note that the Petitioner did not include a transcript from this portion of the trial, but we have reviewed that transcript as part of his appellate record on direct appeal. See Harris v. State, 301 S.W.3d 141, 147 n. 4 (Tenn. 2010) ("The Court may take judicial notice of its own records.") (citing State v. Lawson, 291 S.W.3d 864, 869-70 (Tenn. 2009)). At the trial, trial counsel asked Baltimore the following on direct examination:

Q. Okay. Do you know the gentleman sitting here with the colored shirt, pink shirt on? How long have you known [the Petitioner]?

A. Since he was a kid.

Q. Do you have an opinion as to his – What is your opinions [sic] about him?

A. He's been a fine young man towards me. I mean, I've known him probably twenty years or better.

---

[5] In his petition for post-conviction relief, the Petitioner addressed simultaneously the issues of his decision not to testify and trial counsel's "opening the door" to allow proof of the Petitioner's prior criminal record. On appeal, the Petitioner argues only the latter issue and not his decision not to testify.

At the conclusion of the direct examination, the State requested a bench conference, at which point the following colloquy took place:

State: [Trial counsel]'s brought up [the Petitioner]'s character. He's opened the door –

Court: Yeah, he has.

State: – for his prior record.

The State then cross-examined Baltimore and asked him the following:

Q. Mr. Baltimore, you stated you've known [the Petitioner] for a long time, you gave an opinion as to his character?

A. Pardon me?

Q. Is that correct? You said you've known [the Petitioner] for a long time and you just gave an opinion as to his character?

A. Yes, sir.

Q. Do you know about his prior criminal record?

A. Yes, sir.

Q. Know he's been in prison?

A. Yes, sir.

Q. And what he was in prison for?

A. Yes, sir.

Q. What was he in prison for?

A. I think something about a shooting?

Q. Shot somebody?

A. Right.

Q. During an aggravated robbery.

A. Yes, sir.

In addressing trial counsel's effectiveness in this regard, we first will look at the deficiency prong. Tennessee Rule of Evidence 404(a)(1) states that "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conforminy therewith on a particular occasion, except . . . [i]n a criminal case, evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Thus, this exception "permits the accused in a criminal case to 'open the door' by introducing evidence of his or her own pertinent character trait." Neil P. Cohen et al., TENNESSEE LAW OF EVIDENCE § 4.04[4][a] (6th ed. 2011). Furthermore, "[o]nce the accused puts his or her character in issue by presenting this evidence, the prosecution is free to offer relevant character evidence to rebut the accused's proof." Id.

Here, trial counsel acknowledged that both he and the Petitioner planned to keep the Petitioner's prior criminal record from the jury. He stated that the reason he asked Baltimore about the Petitioner's character was because the Petitioner stopped him before his questioning and said, "He likes me. He's a good friend." Furthermore, trial counsel testified, "And I got – the only reason I think I did it is because it was right new to me." Based on a review of the trial transcript, it is clear that trial counsel's question, "What is your opinions [sic] about [the Petitioner]?" and Baltimore's answer, "He's been a fine young man towards me," opened the door to the State's introduction of the Petitioner's conviction for aggravated robbery in which he shot the victim.

Even if we were to deem trial counsel's questioning of Baltimore a tactical choice, our deference to trial counsel should apply only when those choices "are informed ones based upon adequate preparation." Cooper, 847 S.W.2d at 528 (citing Hellard, 629 S.W.2d at 9). Here, trial counsel admitted that, although he intended to keep the Petitioner's prior criminal record from the jury, he decided in the moment to ask Baltimore about the Petitioner's character. We cannot afford deference to this decision. Moreover, based on the record as a whole on this issue, we hold that trial counsel was deficient in asking Baltimore his opinion of the Petitioner and thus allowing the State to introduce evidence of the Petitioner's criminal record.

Having found deficient performance, we must assess whether the Petitioner suffered prejudice as a result of the introduction of his prior conviction. We note that the evidence presented at trial included the testimony of an accomplice, Armstrong, directly implicating the Petitioner in the crimes and specifically identifying the Petitioner as the person who killed both victims. Additionally, the physical proof at trial was consistent with the testimony of the accomplice and the other witnesses for the State. The proof also included the

identification of the Petitioner by Xavier Johnson. We recognize that the proof at trial also established that witnesses for the Petitioner claimed that Xavier, on a different occasion, identified another individual, Robinson, as the person who killed his father. Also, Robinson acknowledged at the trial that he had left threatening messages on his wife's phone on the evening that she was killed. We, however, note that the proof at trial clearly indicated that more than one individual was involved in these crimes. Additionally, no testimony at trial, other than the statement of two of the Petitioner's witnesses regarding Xavier's alleged gratuitous identification of Robinson, actually linked Robinson to these crimes. Moreover, there was no evidence of Robinson's having an accomplice to help him perpetrate these offenses. Finally, the trial court gave the jury a limiting instruction that evidence of the Petitioner's prior criminal conviction could be used solely for the purpose of assessing the credibility of the particular witness. Thus, based on the entire record, we conclude that the Petitioner has failed to carry his burden of demonstrating that the introduction of a similar offense prejudiced the Petitioner to the extent that it created a "reasonable probability that but for counsel's error[] the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

*Ineffective Assistance on Appeal*

The Petitioner's last claim of ineffective assistance of counsel is that trial counsel failed on appeal to include all the necessary transcripts in the record to facilitate appellate review of the issues raised. Specifically, the Petitioner contends that trial counsel failed to include in the record the transcripts on the hearings for the Motion to Sever and Motion for a Bill of Particulars.

We choose to first address the prejudice prong. In denying relief, the post-conviction court stated,

> The Court does not find that the petitioner is entitled to post-conviction relief on the issue of appeal. The petitioner first of all did not indicate what issues on appeal he felt should have been raised. Evidently, there were some pre-trial motion issues that were not included in the transcript. Trial counsel referred to a Motion to Sever and a Motion for a Bill of Particulars. There is no evidence before the court that even if these matters had been pursued that it would have changed the outcome of the trial. Petitioner has failed to show any prejudice and the Court finds that the petitioner has failed to prove that trial counsel's performance was deficient or that any omission or act by trial counsel resulted in prejudice to the petitioner so as to deprive him of a fair trial.

We agree with the post-conviction court that the Petitioner has failed to establish prejudice in this regard. The Petitioner merely asserts that trial counsel's failure to include the transcripts on these hearings and trial counsel's failure to support these arguments with proper authority on appeal resulted in waiver of these issues. The Petitioner has not established a reasonable probability that, had trial counsel provided the proper transcripts and argument, "the result of the [appellate] proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694); see also Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004) (applying the same two-prong inquiry to claims of ineffective assistance on appeal). Therefore, because the Petitioner has failed to establish prejudice, we need not determine whether trial counsel's representation on appeal was deficient. See Goad, 938 S.W.2d at 370. The Petitioner is entitled to no relief on this issue.

## CONCLUSION

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE